# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ASTRAZENECA PHARMACEUTICALS LP
1800 Concord Pike
Wilmington, Delaware 19850

and

ASTRAZENECA AB
S-151 85
Södertälje, Sweden

and

ASTRAZENECA UK LTD.
1 Francis Crick Avenue
Cambridge Biomedical Campus
Cambridge CB2 0AA
United Kingdom

              Plaintiffs,

vs.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of the U.S. Department of
Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

and

U.S. DEPARTMENT OF HEALTH AND HUMAN
SERVICES
200 Independence Avenue, SW
Washington, DC 20201

and

MEHMET OZ, in his official capacity as
Administrator of the Centers for Medicare and
Medicaid Services
7500 Security Boulevard
Baltimore, Maryland 21244

Civil Action No. _____

and

CENTERS FOR MEDICARE AND MEDICAID
SERVICES
7500 Security Boulevard
Baltimore, Maryland 21244

                    Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs AstraZeneca Pharmaceuticals LP, AstraZeneca AB, and AstraZeneca UK Ltd. (collectively, AstraZeneca) allege as follows:

### INTRODUCTION

1.     In the summer of 2022, Congress enacted legislation dramatically transforming Medicare, the Nation's largest healthcare program. Since its creation decades ago, Medicare had reimbursed healthcare providers and drug dispensers for the cost of covered drugs at rates based on market forces. But as part of the Inflation Reduction Act of 2022 (IRA or Act), Pub. L. 117-169, Congress established a new system in which acquisition prices and reimbursement for selected pharmaceutical products instead will be imposed by the Secretary of the Department of Health and Human Services (HHS), under a program that the Act calls the "Drug Price Negotiation Program" (Program).

2.     The Act gives the Secretary unilateral power over pharmaceutical prices—power that the Secretary must use to impose steep discounts on selected products. These products are subject to statutory price ceilings that embody deep cuts from current, market-based prices. But even more significantly, this government-imposed pricing generally has no floor; for almost any

drug selected under the Program, the Secretary could decide that Medicare should pay only a penny. No ordinary market actor brings that kind of leverage to the "negotiating" table.

3.     In light of these draconian IRA-mandated price cuts, the Program carries monumental stakes for manufacturers—and has serious implications for medical innovation, provider and pharmacy reimbursements, and patient access. Studies indicate that the IRA will significantly curtail investment in medical research, to the detriment of patients.[1]

4.     Because the Act's consequences are so severe, Congress limited and specified with precision the number of drugs that are subject to price caps under the IRA each year. For the Program's first annual cycle, the statute directs the Secretary to select the ten "qualifying single source drugs" (QSSDs) that account for the highest total expenditures under Medicare; directs the Secretary to select fifteen more for its second cycle; directs the Secretary to select fifteen more for its third cycle; and directs the Secretary to select twenty more for its fourth and subsequent cycles. For each annual cycle, CMS must "publish a list of" the specified number of drugs—and no more. 42 U.S.C. § 1320f–1(a).

5.     Yet in implementing the IRA, apparently CMS was not content with the existing scope of its already-sweeping power to dictate pharmaceutical prices. Rather, the agency sought to extend its authority even further, by expanding the stated numerical limit on the number of drugs eligible for price caps under the Program.

---

[1] Over the next decade, as many as 139 drugs are at risk of not being developed at all, meaning fewer innovative therapies for patients and their providers. *See* Vital Transformation, *IRA's Impact on the US Biopharma Ecosystem* (June 1, 2023), https://perma.cc/RRV5-DFGN. These effects are already evident, with sharp cuts in early-stage investment. Since the IRA's enactment, aggregate investment by small and mid-sized firms in new small-molecule medicines has declined by 68%. For treatments targeting diseases with a high proportion of Medicare beneficiaries, median investment size has dropped 74%. *See* Duane G. Schulthess et al., *The Inflation Reduction Act's Impact Upon Early-Stage Venture Capital Investments*, 59 Therapeutic Innovation & Regul. Sci. 769 (2025), https://doi.org/10.1007/s43441-025-00773-3.

6.    CMS has accomplished this power-grab by rewriting key statutory language. Under agency-issued guidance, CMS has redefined the term "qualifying single source drug" to sweep *multiple* products within each QSSD—in effect, treating two or more distinct drugs as a *single* QSSD.

7.    There is nothing in the statute that permits the agency to redefine its terms in order to circumvent the clear limit on the number of drugs eligible for the Program. To the contrary, the Act makes clear that its numerical limits must be respected: It defines a QSSD as "[a] drug that *is approved* under" the Federal Food, Drug, and Cosmetic Act, but only if "at least 7 years will have elapsed since the date *of such approval*." 42 U.S.C. § 1320f–1(e)(1)(A)(i)-(ii) (emphases added).

8.    As the italicized language indicates, a QSSD must be a *single* drug subject to a *single* "approval." The IRA provides that the relevant "approval" is the drug's approval by the U.S. Food and Drug Administration (FDA) under a New Drug Application (NDA). The NDA is the fundamental building block of FDA's framework for approving new drugs. FDA will approve an NDA only after a "long, comprehensive, and costly testing process" designed to determine whether the drug will be safe and effective to treat identified conditions in a specific patient population. *FTC v. Actavis, Inc.*, 570 U.S. 136, 142 (2013). And federal law attaches a host of consequences to NDA-approval, including permission to market the drug and a set period of exclusivity for most drugs that runs from the approval's effective date.

9.    The statutory QSSD definition accords with that understanding. A separate approval of an NDA (each "such approval") potentially gives rise to a new QSSD, whose eligibility for the Program must be determined based on Medicare expenditures for *that* individual drug, and whose seven-year exemption period runs from FDA approval of *that* drug's NDA. This straightforward reading of the text also makes good sense: FDA approval is grounded in substantial

4

safety and efficacy information—usually developed through years of clinical testing and millions, or even billions, of research dollars—justifying use of the drug for particular indications and particular patient populations.

10.    Each "such approval" thus gives rise to a different FDA-approved drug, and hence a different potential QSSD, which must be considered on its own merits for potential selection for the Program, until the Act's numerical threshold has been reached—but not beyond.

11.    In guidance implementing the Program, however, CMS has sought to expand the numerical limit on eligible drugs by adopting an alternative definition of QSSD that contravenes the Act's clear text. *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Drug Price Negotiation Program: Final Guidance* (Oct. 2, 2024) (Final Guidance).[2] The guidance announces that the agency will "identify a potential qualifying single source drug using . . . all dosage forms and strengths of the drug with the same active moiety and the same holder of a New Drug Application (NDA), *inclusive of products that are marketed pursuant to different NDAs*." *Id.* § 30.1 at 167 (emphasis added).

12.    Under that approach, two or more *distinct* drugs that were evaluated and approved by FDA through different NDAs under entirely *separate* approval processes will nevertheless be

---

[2] On June 30, 2023, CMS issued guidance to govern the first cycle of the Program, which AstraZeneca has challenged in the U.S. District Court for the District of Delaware. *See* Am. Compl. *AstraZeneca Pharms. LP v. Becerra*, No. 23-CV-931, Dkt. 16 ¶¶ 47–48 (D. Del., Sept. 26, 2023). The court dismissed AstraZeneca's APA claims for lack of standing. *AstraZeneca Pharms. LP v. Becerra*, 719 F. Supp. 3d 377, 387 (D. Del. 2024). AstraZeneca appealed that decision, and the Third Circuit affirmed. *See AstraZeneca Pharms. LP v. HHS*, 137 F.4th 116 (3d Cir. 2025). AstraZeneca has petitioned the U.S. Supreme Court for a writ of certiorari, which is currently pending. *See AstraZeneca Pharms. LP v. HHS*, No. 25-348 (S. Ct.). In September 2025, CMS issued guidance for the IRA's third annual cycle, with price caps taking effect in 2028. *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Drug Price Negotiation Program: Final Guidance* (Sept. 30, 2025), https://edit.cms.gov/files/document/ipay-2028-final-guidance.pdf.

treated collectively as a *single* QSSD, for purposes of selection under the Program, so long as they share the same "active moiety" and the same NDA-holder (which the agency refers to as the "primary manufacturer" of the selected drug). And the drugs will be combined for selection purposes even if they reflect significant ingredient or formulation differences warranting a new NDA, and even if they were approved at different times or to treat different diseases and different patient populations.

13.    CMS's approach of lumping together separately approved products is a transparent effort to nullify the central constraint on the Program's scope. Since it allows two or more products approved under separate NDAs to be treated as a single QSSD, the agency's approach facially contravenes the statute's numerical limits on drug selection, with both the purpose and effect of applying the Program's draconian price caps to a far broader range of products—including products that, standing alone, would not qualify for selection. 42 U.S.C. § 1320f–1(a).

14.    CMS's approach also means that even brand-new products could be subject to selection and negotiation *immediately* upon approval, contrary to the prohibition on selecting products until "at least 7 years will have elapsed since the date of [FDA] approval." 42 U.S.C. § 1320f–1(e)(1)(A)(i)-(ii). Under the agency's approach, if products that share the same active moiety are approved under more than one NDA, the clock would begin to run from when FDA approved the *first* NDA, rather than separate clocks that run for each product from the date of approval of its distinct NDA. The text of the statute does not permit CMS's approach.

15.    Moreover, *nothing* in the statute justifies CMS's peculiar approach of aggregating together separately approved drugs based on a common active moiety and common identity of the NDA-holder—criteria that appear nowhere in the statute. CMS's approach contravenes the statute's clear instructions.

6

16.     CMS's approach is not just legally impermissible, but also practically harmful. It will discourage pharmaceutical manufacturers from investing time and money to discover whether an active moiety in an existing drug could be developed into a new product to treat different diseases or patient populations or to improve safety or efficacy. In the eyes of the agency, any Medicare expenditures for the new product approved under a separate NDA would be lumped together with expenditures for the existing product, thereby increasing the likelihood that the agency will select *both* products for the draconian Drug Price Negotiation Program—subjecting them to the Program's steep cuts in payment and reimbursement, potentially on the very first day of a new product's FDA approval. The agency's approach thus incentivizes manufacturers *not to* innovate.

17.     This harm is particularly acute for the development of oncology drugs, where post-approval research is critical for discovering additional uses for cancer medicines that can benefit more patients. In fact, among oncology drugs approved from 2000 to 2021, 57% of approved indications and 68% of industry-sponsored clinical trials occurred post-approval. Approximately half of these post-approval indications were in new oncology disease areas—thus delivering new treatment options for more cancer patients—and many occurred several years after the molecule's initial approval.  *See* Henry Grabowski et al., *Postapproval Innovation For Oncology Drugs And The Inflation Reduction Act*, 43 Health Affs. 1400 (2024), https://bit.ly/4j8BJVQ.

18.     AstraZeneca asks this Court to set aside the section of the agency's Final Guidance that eviscerates the statutory limit on the number of drugs eligible for the Program by redefining "qualifying single source drug" as including separately approved products that share the same active moiety and NDA-holder. Restoring fidelity to the statutory text will ensure that the agency

7

implements the Program within the parameters specified by the IRA, so that government-mandated price controls apply only to the number of drugs for which Congress actually authorized them.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701-06 (Administrative Procedure Act). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other appropriate relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705-06.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this action seeks relief against federal agencies and officials acting in their official capacities, Defendant CMS is located within this District, and no real property is involved in the action.

## PARTIES

21.     Plaintiff AstraZeneca Pharmaceuticals LP, a limited partnership organized in Delaware with its principal place of business in Wilmington, Delaware, is a biopharmaceutical company focusing on the discovery, development, manufacturing, and commercialization of medicines.

22.     Plaintiff AstraZeneca AB, a company operating and existing under the laws of Sweden, with its principal place of business at S-151 85 Södertälje, Sweden, is the corporate parent of AstraZeneca Pharmaceuticals LP.

23.     Plaintiff AstraZeneca UK Ltd., a company operating and existing under the laws of the United Kingdom, with its principal place of business at 1 Francis Crick Avenue, Cambridge Biomedical Campus, Cambridge CB2 0AA, United Kingdom, is an indirect shareholder of AstraZeneca Pharmaceuticals LP.

24.     Plaintiffs are referred to here collectively as "AstraZeneca."

25.     Defendant Robert F. Kennedy, Jr. is the Secretary of HHS. The IRA directs the Secretary to establish the Drug Price Negotiation Program. He is sued in his official capacity.

26.     HHS is a department of the United States Government that is headquartered in Washington, D.C, and is responsible for the Centers for Medicare and Medicaid Services and the Medicare program.

27.     Defendant the Centers for Medicare and Medicaid Services (CMS) is an executive agency within HHS that is headquartered in Maryland. CMS is responsible for administering the Medicare program and relevant statutory provisions challenged here.

28.     Defendant Mehmet Oz is the Administrator of CMS. He administers the Program on behalf of the Secretary. He is sued in his official capacity.

## BACKGROUND

### *FDA's Drug Approval Process*

29.     All "new drugs" must be approved by FDA before being introduced into interstate commerce. 21 U.S.C. § 355(a). A manufacturer thus must submit a New Drug Application, or NDA, to request that FDA approve the drug.

30.     As FDA has explained, the "goals of the NDA" are to allow the agency to determine (1) "[w]hether the drug is safe and effective in its proposed use(s), and whether the benefits of the drug outweigh the risks"; (2) "[w]hether the drug's proposed labeling (package insert) is appropriate, and what it should contain"; and (3) "[w]hether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity." FDA, *New Drug Application* (Jan. 21, 2022), https://www.fda.gov/drugs/types-applications/new-drug-application-nda.

31.     Obtaining approval for an NDA involves a "long, comprehensive, and costly testing process." *FTC v. Actavis, Inc.*, 570 U.S. 136, 142 (2013). Among other things, the manufacturer must submit "full reports of investigations" into the drug's safety and effectiveness, "a full list of the articles used as components," and a "full description" of how the drug is manufactured, processed, and packed. 21 U.S.C. § 355(b)(1). In other words, "[t]he documentation required in an NDA is supposed to tell the drug's whole story." *New Drug Application*.

32.     If, at the end of this process, FDA is ultimately persuaded of the drug's safety and efficacy, the manufacturer will receive "marketing approval." 21 U.S.C. § 355(d). The date that such approval "shall be made effective" is fixed by statute according to specified criteria. *Id.* § 355(c)(3).

33.     "FDA has interpreted the word 'drug' in the term 'new drug' to refer to the entire drug product and not just its active ingredient," 86 Fed. Reg. 28605, 28606. Drugs with different "active ingredients" are thus typically considered for approval under separate NDAs.

34.     But the agency also recognizes that even a single "active ingredient can have different effects on the body depending on the formulation of the drug and its route of administration." FDA, *Guidance for Industry Submitting Separate Marketing Applications and Clinical Data for Purposes of Assessing User Fees*, 3 & n.7 (Dec. 2004) (*Separate Marketing Applications Guidance*), https://www.fda.gov/media/72397/download. "That is why when it reviews an application, FDA carefully evaluates, for each drug product, not only the active ingredient but also information about the drug's formulation, route of administration, labeling, inactive ingredients, bioavailability, and manufacturing processes." *Id.* FDA accordingly defines "drug product" in terms of its "finished dosage form, e.g., tablet, capsule, or solution, that contains a drug substance, generally, but not necessarily, in association with one or more other ingredients,"

and also defines "drug substance" as the active ingredient intended to furnish pharmacological activity in the treatment of a disease. 21 C.F.R. § 314.3. This "product-specific interpretation of 'new drug' underpins FDA's drug regulatory system" and "has significant implications for public health." *Id.*

35.     After an NDA has been approved, the manufacturer generally may not change any aspect of the drug, beyond the variations "already provided for in the NDA," without providing notice to FDA. *Id.* § 314.70(a)(1)(i). Under FDA regulations, the type of FDA notice turns on the nature of the change and its potential effect on the approved drug. Changes are categorized as "minor," "moderate," or "major" based on whether a change has a minimal, moderate, or substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of the drug product as these factors relate to the safety or effectiveness of the drug. *Id.* § 314.70. For "minor" and "moderate" changes, sponsors are required to simply notify FDA of the change, following processes set forth in the regulations, and FDA approval is not required before the sponsor effects the change. *Id.* § 314.70(c)-(d).

36.     For "major" changes to an existing drug, FDA regulations require sponsors to submit a "supplement" to the original NDA and to obtain approval from FDA before effecting the change. FDA refers to such supplements as "prior approval supplements." *Id.* § 314.70(b). Under the regulations, changes requiring a prior approval supplement to the NDA include "changes in the qualitative or quantitative formulation of the drug product, including inactive ingredients, or in the specifications provided in the approved NDA" (with certain exceptions). *Id.* § 314.70(b)(2)(i).

37.    Importantly, changes to a drug approved through a supplement are still considered part of the *existing* NDA. Thus, a supplement is approved under the existing NDA number, and is not assigned a new NDA number.

38.    By contrast, there are certain types of changes to an approved drug that are so significant that FDA requires submission and approval of a new *separate and original NDA*, rather than a supplement to the existing NDA.

39.    FDA's policy for changes that rise to the level of requiring a separate original NDA is described in agency guidance. The agency's *Separate Marketing Applications Guidance* describes different categories of changes and when such changes should be submitted in a separate original NDA instead of a supplement to an existing NDA.

40.    Typically, a new NDA is required instead of a supplement when, for example, an applicant is seeking approval for a drug product that contains a different  "active ingredient" than previously approved (whether or not the "active moiety"[3] is different), a  different  "dosage form," or a different "formulation" (*i.e.*, a drug's active ingredient(s) in association with its inactive ingredients). *See* FDA, *Manual of Policies and Procedures 5018.2* (eff. Dec. 8, 2022), https://www.fda.gov/media/94381/download. By contrast, changes to dosage forms, strengths, and formulations may be encompassed within a single NDA under certain circumstances.

41.    Consider dosage form—that is, a drug's physical features, such as tablets, capsules, injectables, etc. *See Drugs@FDA Glossary of Terms* (2017), https://www.fda.gov/drugs/drug-approvals-and-databases/drugsfda-glossary-terms. For dosage form changes to an approved drug,

---

[3] As discussed below, an "active moiety" is the "molecule or ion that drives the action of the drug." FDA, *Q&A: GFI #256 - Compounding Animal Drugs from Bulk Drug Substances* (Aug. 27, 2024), https://bit.ly/4o5snL9.

whether the sponsor should submit a supplement to the existing NDA or a separate original NDA turns on how the quantitative and qualitative formulation of the new dosage form compares to that of the previously approved product. A new dosage form can be approved through a *supplement* if the formulation of the new dosage form is "quantitatively and qualitatively identical" to that of the previously approved product. *Separate Marketing Applications Guidance* at 3. But if the formulation of the new dosage form *is not* "quantitatively and qualitatively identical" to that of the previously approved product, FDA recommends submission of a *separate original NDA*. *Id.*

42.     Of particular relevance here, another type of change addressed in the guidance is a change in strength. For new strengths, whether a sponsor should submit a separate original NDA or a supplement turns on how the qualitative (but not quantitative) formulation of the new strength compares to that of the previously approved product. If the formulation of the new strength is "qualitatively identical" to that of the previously approved product, FDA recommends submission of a *supplement* provided the new strength is for the same dosage form and route of administration as the previously approved product. *Id.* at 3-4. If the formulation of the new strength is *not* "qualitatively identical" to that of the previously approved product, FDA recommends submission of a *separate original application*. *Id.* The guidance indicates FDA expects most strength changes can be submitted as a supplement, suggesting that most strength changes involve only quantitative formulation changes, not qualitative formulation changes. *See id.* at 5.

43.     Whether a new "formulation" requires a new NDA or may be submitted through a supplement similarly depends on the circumstances. For example, "[a] change to an approved product . . . that changes . . . the formulation (e.g., different excipients) can be submitted as a supplement to an approved application" and "would not ordinarily warrant a new original

application unless it" results in a quantitative or qualitative change to the composition of an approved product to support "changes [to] the dosage form or route of administration." *Id.*

44.    New drugs regularly require new NDAs despite sharing an "active moiety" with a drug that has already been approved. For example, FDA has said that drugs with the same active moiety but different active ingredients are considered for approval under separate NDAs. That is because the agency requires submission of a separate NDA if an applicant develops a drug product with a different "active ingredient" than the applicant's previously approved drug product, and two drugs can have different "active ingredients" despite having the same "active moiety." There is a good reason for this difference: In determining a drug's "active moiety," FDA excludes appended portions of a drug that cause it to be a salt, ester, or other non-covalent derivative. *See* 21 C.F.R. § 314.3(b). In determining the "active ingredient," by contrast, FDA includes those appended portions of a drug. *Id.* FDA defines "active ingredient" as "any component that is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease." *Id.* As a result, if an applicant develops two salts with different structures derived from the same active moiety (and the salts are the components intended to furnish pharmacologic action), FDA considers the salts to have *different* active ingredients and requires approval through *separate* NDAs.

45.    Likewise, new *dosage forms* often require new NDAs, irrespective of any shared active moiety or shared active ingredient, because developing a different dosage form generally entails adding, removing, or changing the ratios of inactive ingredients—thereby resulting in a formulation with "qualitative or quantitative" differences from that of the applicant's previously approved dosage form. *Separate Marketing Applications Guidance* at 3 & n.7; *see* FDA, Manual of Policies and Procedures 5018.2 (eff. Dec. 8, 2022).

46.     The NDA framework has significant implications for generic competition as well. "[O]nce the FDA has approved a brand-name drug for marketing, a manufacturer of a generic drug can obtain similar marketing approval through use of abbreviated procedures." *Actavis*, 570 U.S. at 142. Under 21 U.S.C. § 355(j), a generic manufacturer may file an "Abbreviated New Drug Application," or ANDA, showing that the generic has the same active ingredient, dosage form, strength, and route of administration as, and is bioequivalent to, a particular "listed" (*i.e.*, brand-name) NDA drug. *See id.* § 355(j)(2)(A)(i). As part of the ANDA, the applicant is required to identify the specific NDA that the ANDA references as the so-called "listed" drug. Food & Drug Admin., *Guidance for Industry, ANDA Submissions — Content and Format* (June 2019), available at https://www.fda.gov/media/128127/download.

### *The Inflation Reduction Act*

47.     Enacted in 1965, the Medicare program provides health insurance for individuals 65 years of age and older, some individuals with disabilities under age 65, and individuals with certain conditions such as end-stage renal disease. Medicare Part B generally provides eligible patients with insurance coverage for drugs and biologicals that are administered by physicians (or other health care providers). Medicare Part D provides eligible patients with insurance coverage for prescription drugs that are dispensed by pharmacies.

48.     The Inflation Reduction Act of 2022 establishes a "Drug Price Negotiation Program" for setting acquisition prices and reimbursement rates under Medicare for a specified number of products per annual cycle.

<u>CMS Selects a Specified Number of "Qualifying Single Source Drugs" for the Program</u>

49.     The IRA directs the Secretary to establish a "Drug Price Negotiation Program," 42 U.S.C. § 1320f(a), which is administered by CMS. The Program is limited to Medicare Part D drugs for the first two annual cycles, after which CMS also may select Part B drugs. *Id.* § 1320f(b).

50.     The statute sets forth a three-step process for the agency to select drugs for the Program.

51.     ***First***, CMS must identify "qualifying single source drugs" (QSSDs), which encompass many innovative first-in-class and best-in-class drug products. The statute defines a QSSD to include a drug product that is "a covered part D drug (as defined in [42 U.S.C. § 1395w–102(e)])" and:

> (i) that *is approved* under section 355(c) of title 21 and is marketed pursuant to *such approval*;
>
> (ii) for which, as of the selected drug publication date with respect to such initial price applicability year, *at least 7 years will have elapsed since the date of such approval*; and
>
> (iii) that is not the listed drug for any drug that is approved and marketed under section 355(j) of title 21.

*Id.* § 1320f–1(e)(1)(A) (emphases added).[4]

52.     ***Second***, after identifying all QSSDs, CMS must determine which QSSDs qualify as "negotiation eligible drugs." *Id.* § 1320f–1(d). To make this determination, CMS must rank QSSDs based upon each drug's total expenditures under Medicare Part D or Part B, respectively, over the previous twelve-month period. *Id.* § 1320f–1(d)(1). Because only Part D drugs can be selected during the first two cycles, the agency ranks drugs only by Part D expenditures during these initial cycles. *Id.* § 1320f–1(d)(1)(A). The QSSDs that are among the top 50 highest

---

[4] The IRA excludes certain drugs from the definition of QSSD, including "[c]ertain orphan drugs," "[l]ow-spend Medicare drugs," and "[p]lasma-derived products." 42 U.S.C. § 1320f–1(e)(3).

expenditure Part D or Part B drugs, respectively, are known as "negotiation-eligible drugs." *Id.*
§ 1320f–1(d).

53.     When taking this second step of determining whether a QSSD ranks as a
negotiation-eligible drug, the statute includes a "Use of Data" provision, which states:

> In determining whether a qualifying single source drug satisfies any of the criteria
> described in paragraph (1) or (2) [(*i.e.*, the criteria for negotiation-eligible drugs)], the
> Secretary shall use data that is aggregated across dosage forms and strengths of the drug,
> including new formulations of the drug, such as an extended release formulation, and not
> based on the specific formulation or package size or package type of the drug.

*Id.* § 1320f–1(d)(3)(B).

54.     Thus, after the agency has identified each QSSD, the Use of Data provision
instructs the agency to aggregate the approved dosage forms and strengths *within each* QSSD to
determine whether the Medicare expenditures for that QSSD reach the top-50 threshold, at which
point the QSSD becomes a negotiation-eligible drug.

55.     ***Third***, the statute directs the agency to select a specified number of the highest-
ranked negotiation-eligible drugs for the Program each year. *Id.* § 1320f–1(a)-(b). CMS was
required to select *ten* Part D drugs during the first annual cycle, with price caps taking effect in
2026; and *fifteen* more during the second cycle, with price caps taking effect in 2027. *Id.* § 1320f–
1(a)(1)-(2). After Part B drugs are added beginning in the third cycle, the statute directs CMS to
select *fifteen* Part B or D drugs for price caps taking effect in 2028; and *twenty* more Part B or D
drugs for the fourth cycle and each one thereafter. *Id.* § 1320f–1(a)(1), (3)-(4).

56.     The drug-selection process is cumulative: Once a drug is selected, it remains a
selected drug until a defined period after the agency determines that a generic version of the drug
has been approved by the FDA and marketed "pursuant to such approval." *Id.* § 1320f–1(c)(1)(B).
The number of drugs subject to the Program thus mounts over time.

17

CMS Imposes "Maximum Fair Prices" Through So-Called "Negotiations"

57.    Once innovative drugs are ranked and selected, the IRA directs the agency to "enter into agreements" with manufacturers, beginning the process through which CMS sets "maximum fair prices" (MFPs) for the selected drugs. *Id.* § 1320f–2(a)(1).

58.    While the statute calls this process a "negotiation," it is a negotiation only in name. In reality, the IRA enables CMS to *dictate* the MFP for a selected drug, and further *compels* the manufacturer to "agree" to it. *Id.* § 1320f–3(c).

59.    To set (*i.e.,* dictate) the MFP, the IRA directs the agency to "develop and use a consistent methodology and process . . . for negotiations . . . that aims to achieve the *lowest* maximum fair price for each selected drug." *Id.* § 1320f–3(b)(1) (emphasis added).

60.    With a minor exception not relevant here, the law places no floor constraining the price CMS can impose; nor does it provide a clear standard for the agency to use in selecting prices. But it does impose caps on how high a price CMS can set, directing the Secretary to use the lowest number yielded by various alternative calculations specified by statute. *See, e.g.*, *id.* § 1320f–3(b)(2)(F), (c).

61.    As the last step in the price-setting process, the statute requires CMS to "compute and apply the [MFP] across different strengths and dosage forms of a selected drug." *Id.* § 1320f–5(a)(2). Thus, CMS must adjust and apply the MFP to each strength and dosage form that falls under that selected drug (*i.e.*, to those strengths and dosage forms that were part of the QSSD identified in the first step of the selection process).

62.    Once CMS has imposed an MFP for a selected drug, the manufacturer must provide "access to such price to" a wide variety of individuals and entities participating in Medicare. *Id.* § 1320f–2(a)(1). These participants include all eligible Medicare beneficiaries who are dispensed

drugs under Medicare Parts B and D; all "pharmacies, mail order services, and other dispensers" that dispense drugs to Medicare beneficiaries; and all "hospitals, physicians, and other providers of services and suppliers" that furnish or administer drugs to Medicare beneficiaries. *Id.* § 1320f–2(a)(1)(A)-(B); *id.* § 1320f(c)(2). Further, Medicare reimbursement rates for selected drugs are tied to the MFP. *See id.* § 1395w–102(d)(1)(D) (Part D negotiated price is capped at the maximum fair price plus any dispensing fee); *id.* § 1395w–3a(b)(1)(B) (provider payment amount for Part B selected drugs is the MFP plus six percent).

63.    Manufacturers that fail to provide the required access to the MFP are subject to a civil monetary penalty of *ten times* the difference between the "price for such drug made available . . . by such manufacturer" and the MFP, multiplied by the total number of units sold. *Id.* § 1320f–6(a).

<u>CMS Compels Participation in the Program Through a Hobson's Choice: Threat of a Crippling "Excise Tax" or Complete Withdrawal from Medicare and Medicaid</u>

64.    Although the Drug Price Negotiation Program is designed to mimic a negotiation—including use of terms like "offer," "counteroffer," and "negotiation," *id.* § 1320f–3—the statute uses these terms to conceal the true nature of the process. In reality, the Program is designed to coerce manufacturers to submit to government-imposed prices.

65.    The Program is enforced through massive civil monetary penalties, *id.* § 1320f–6, and an "Excise Tax Imposed on Drug Manufacturers During Noncompliance Periods," IRA § 11003. A manufacturer of a selected drug who fails to enter into a Program agreement (at the initiation of the "negotiation" period) or who fails "agree" to the ultimate price that CMS sets is subject to a steep and escalating daily penalty, 26 U.S.C. § 5000D(b), which under the statute *starts* at approximately 186% and escalates to 1,900% of *each sale* of the selected drug—not merely

Medicare sales, *id*. § 5000D(a).[5] *See* Cong. Rsch. Serv., *Tax Provisions in the Inflation Reduction Act of 2022 (H.R. 5376)* 4 tbl. 2 (2022) ("The excise tax rate would range from 185.71% to 1,900% of the selected drug's price depending on the duration of noncompliance."). The excise-tax penalty thus represents a multiple of the manufacturer's *total revenues* from the drug in question, not merely its profits. The penalty continues to accrue every day until the manufacturer acquiesces to CMS's demands (or until the drug in question ceases to be a selected drug).

66.     The "alternative" to the excise tax is for a manufacturer to exit Medicare and Medicaid with respect to *all* of its products—not just the selected drug. The IRA provides for the "[s]uspension" of the punitive excise-tax penalty, but only if the manufacturer terminates its Medicare Part D and Medicaid rebate agreements for *all* of the manufacturer's drugs. 26 U.S.C. § 5000D(c). What is more, because a manufacturer must "have in effect a [Medicaid] rebate agreement" in order for a drug to be payable under Medicare Part B, terminating the Medicaid rebate agreement would also result in the manufacturer losing Part B coverage for all of its products. 42 U.S.C. § 1396r–8(a)(1). Thus, in order to suspend application of the tax penalty, a pharmaceutical manufacturer must entirely cease participation in both Medicare and Medicaid.[6]

---

[5] The Internal Revenue Service has stated in a proposed rule that the excise tax will only apply to Medicare sales of the selected drug. *See* 90 Fed. Reg. 31 (Jan. 2, 2025). The statutory text, however, contains no such limitation.

[6] Nor could these programs voluntarily cover the manufacturer's products in the absence of these agreements. The IRA explicitly prohibits Part D plans from covering drugs of a manufacturer that has terminated its Part D agreement to suspend the excise tax. 42 U.S.C. § 1395w–153(c)(2). Although generally there is a narrow exception that allows Part D plans to cover drugs of a manufacturer without a Part D agreement if the agency determines that such drugs are "essential to the health" of Medicare beneficiaries, the IRA specifies that this exception does not apply if a manufacturer terminates its Medicare Part D agreement to avoid the excise tax. Likewise, covered outpatient drugs that do not fall under a Medicaid rebate agreement are not covered under the Medicaid Drug Rebate Program or Medicare Part B. *Id.* § 1396r–8(a)(1). Although there is an exception that allows Medicaid state plans to cover such a drug if the plan determines the drug is "essential to the health" of beneficiaries of their plan, the IRA prohibits Medicaid plans from covering the drug if a manufacturer terminates its Medicaid rebate agreement to avoid the excise tax. *Id.* § 1396r–8(a)(3).

67.    Exiting the Medicare and Medicaid programs would not only be financially devastating for a manufacturer of a selected drug, but it would also jeopardize Medicare and Medicaid beneficiaries' access to *all* the manufacturer's medicines—not only the selected drug. The potential impact would be catastrophic, with Medicare and Medicaid accounting for nearly half of the U.S. prescription drug market. Cong. Budget Off., *Prescription Drugs: Spending, Use, and Prices* (Jan. 2022) at 8, https://www.cbo.gov/publication/57050.

### CMS Program Guidance Seeks to Override the IRA's Defined Limits

68.    On May 3, 2024, CMS issued draft guidance setting forth the agency's plan for implementing the Program during its second cycle—initial price applicability year 2027 (IPAY 2027)—for which the IRA directs CMS to select *fifteen* Part D drugs for "negotiation." *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Drug Price Negotiation Program: Draft Guidance* (May 3, 2024) (Draft Guidance). Although the statute does not contain any exceptions to the fifteen-drug limit or provide any basis to expand that number, CMS's draft guidance requires just that.

69.    Specifically, CMS sought to override the IRA's express numerical limitation through Section 30 of its Draft Guidance, which articulates "the requirements governing the identification of qualifying single source drugs." *Id.* § 30 at 5. In its Draft Guidance, CMS announced that it would "identify a potential qualifying single source drug using . . . all dosage forms and strengths of the drug with the same *active moiety* and the same holder of a New Drug Application (NDA), *inclusive of products that are marketed pursuant to different NDAs.*" *Id.* § 30.1 at 8 (footnote omitted) (emphases added).

70.    The term "active moiety" does not appear in the IRA. According to FDA regulations implementing a *different* statute, the Federal Food Drug and Cosmetic Act (FDCA),

active moiety "is the molecule or ion . . . responsible for the physiological or pharmacological action of the drug substance." 21 C.F.R. § 314.3. As discussed above, drugs that share an "active moiety" can still require distinct NDAs—for instance, when they contain different "active ingredients." *See Separate Marketing Applications Guidance* at 3 & n.7. In other words, distinct drugs can *share* an active moiety yet have *different* active ingredients that require them to be approved under *separate* NDAs.

71.    Thus, under the QSSD definition in CMS's Draft Guidance, two or more *distinct* drugs with *different* active ingredients—evaluated and approved by the FDA under entirely separate processes at different times based on separate efficacy and safety data—could nevertheless be treated collectively as a *single* QSSD. So long as they share the same "active moiety" and have the same NDA-holder, CMS announced that it intended to aggregate their Medicare sales for purposes of selection under the Program. Draft Guidance § 30.2 at 14.

72.    The agency also announced that, where two or more products with the same active moiety were approved under different NDAs, the clock would begin to run from the "earliest date of approval or licensure of the initial FDA application." *Id.* § 30.1 at 10. As a result, a new product could be subject to selection, negotiation, and an MFP under the Program *immediately* upon FDA approval—so long as it shares an active moiety and NDA-holder with an older product— notwithstanding the IRA's prohibition on selecting products until "at least 7 years will have elapsed since the date of such approval." 42 U.S.C. § 1320f–1(e)(1)(A)(i)-(ii).

73.    The agency acknowledged that the QSSD definition articulated in Section 30 was severely criticized, among other things, as "contradict[ing] the statute," which "defines a qualifying single source drug in reference to a distinct NDA." Final Guidance at 12. But when CMS finalized the guidance for the second cycle of selected drugs on October 2, 2024, it adopted

the interpretation of the QSSD definition in Section 30 without meaningful change. *See id.* § 30.1 at 167-68.

74.    On January 17, 2025, CMS applied the Final Guidance to "publish a list of" ostensibly "fifteen" drugs for the second cycle. *See* 42 U.S.C. § 1320f–1(a). Instead of including only fifteen drugs, however, CMS exceeded that number by purporting to treat multiple drugs as single QSSDs. *See* Ctrs. for Medicare & Medicaid Servs., *Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2027* (Jan. 17, 2025), https://www.cms.gov/files/document/factsheet-medicare-negotiation-selected-drug-list-ipay-2027.pdf.

### *Acalabrutinib Free Base and Acalabrutinib Maleate Salt*

75.    An illustration of this circumvention at work is how the Final Guidance lumps together two different drug products manufactured by AstraZeneca to treat certain forms of leukemia and lymphoma: acalabrutinib free base and acalabrutinib maleate salt. These drug products were approved by FDA years apart, pursuant to separate NDAs. Although the two drugs share an active moiety, they have different active ingredients and different dosage forms. And even beyond those distinctions, the two drugs differ in their formulations. As a result, they were *required* to be approved under distinct NDAs.

76.    AstraZeneca developed acalabrutinib free base and acalabrutinib maleate salt to treat: (i) adult patients with mantle cell lymphoma (MCL) who have received at least one prior therapy; (ii) adult patients with previously untreated MCL who are ineligible for autologous hematopoietic stem cell transplantation, in combination with bendamustine and rituximab; and (iii) adult patients with chronic lymphocytic leukemia (CLL) or small lymphocytic lymphoma (SLL). These products work by blocking the signal from a protein called Bruton tyrosine kinase, or BTK,

that leads to the growth of abnormal cancerous B cells (a type of white blood cells). By blocking BTK, these products help stop certain cancer cells from forming or growing and cause cancer cells to die. *See* AstraZeneca, *How Does Calquence Work?*, https://perma.cc/U42V-H5SM.

77.     MCL and CLL/SLL are serious and life-threatening types of blood cancers. MCL is a rare and fast-growing subtype of B-cell non-Hodgkin lymphoma that is typically diagnosed at an advanced stage and associated with a high relapse rate. It is estimated that approximately 4,000 new cases of MCL are diagnosed each year. *See* Chan Yoon Cheah et al., *Mantle cell lymphoma*, 34 J. Clin. Oncol. 1256 (2016). CLL/SLL is a slow-growing cancer that affects B cells. CLL and SLL are distinguished by where cancer cells are mostly located; in CLL, cancer cells are found mostly in the blood and bone marrow, while in SLL, cancer cells are found mostly in the lymph nodes. *See* AstraZeneca, *What Should I Know About My Condition?*, https://perma.cc/9XBF-E6YS. CLL/SLL is the third-most common type of B-cell lymphoma, with approximately 18,740 people in the United States diagnosed with CLL/SLL each year. *See* Lymphoma Research Foundation, *Understanding Lymphoma and Chronic Lymphocytic Leukemia/ Small Lymphocytic Lymphoma (CLL/SLL)*, 154 (2023), https://perma.cc/X4HH-89T4.

78.     MCL and CLL/SLL are rarely curable. Instead, the aim of treatment is to slow down progression of the disease, to relieve patients of symptoms, and, if possible, to increase overall survival.

79.     In 2017, FDA granted an NDA, uniquely identified by the number 210259, for acalabrutinib free base to be marketed under the brand name CALQUENCE®. FDA initially approved acalabrutinib free base for treatment of adult patients with MCL who have received at least one prior therapy. Subsequently, AstraZeneca submitted certain supplements to the NDA to request additional indications. Today, acalabrutinib free base is indicated for the treatment of adult

patients with MCL who have received at least one prior therapy, transplant-ineligible adult patients with previously untreated MCL (in combination with bendamustine and rituximab), and adults patients with CLL or SLL.

80.     Since the initial 2017 approval, the Prescribing Information for acalabrutinib free base has included a caution against co-administration with many common stomach acid-reducing medications, including proton pump inhibitors (PPIs), antacids, and H2-receptor antagonists (H2RAs), limiting the patient population able to benefit from it. Specifically, the Prescribing Information cautions to avoid co-administration of CALQUENCE® with PPIs and to stagger dosing with antacids and H2RAs.

81.     Acid-reducing agents are among the most commonly prescribed medications in North America and Western Europe and are frequently used by cancer patients. One study estimated that, among cancer patients in the United States, between 20 and 33 percent had taken an acid-reducing agent within six months of their cancer diagnosis. Among patients with CLL in particular, the prevalence was between 18.5 and 21.9 percent. *See* Gillian Smelick et al., *Prevalence of acid-reducing agents (ARA) in cancer populations and ARA drug-drug interaction potential for molecular targeted agents in clinical development*, 10 Mol. Pharm. 4055 (2013).

82.     This labeling cautioning against co-administration with many common stomach acid-reducing medications meant that the patient population able to benefit from acalabrutinib free base was significantly curtailed, or else it required patients to cease taking gastric-reducing agents or, with respect to certain medications, to adhere to particular dosing schedules to mitigate possible drug interactions.

83.     Given these limitations, AstraZeneca invested substantial effort in developing a new product that would be just as effective as the free base but could also be taken along with

gastric acid-reducing agents. After years of research—and millions in R&D costs—AstraZeneca developed a new product that contains a new active ingredient (acalabrutinib maleate) and is administered through a dosage form with a new formulation (tablets). This new product was formulated to quickly and completely deliver the same amount of medicine across physiological pH levels, therefore allowing it to be taken along with gastric acid-reducing agents.

84.     During development, AstraZeneca met with members of the FDA's Office of New Drug Products to obtain feedback on its planned development for the new acalabrutinib maleate salt and the appropriate regulatory pathway for potentially obtaining FDA approval. Given the difference in active ingredient and in the qualitative and quantitative formulation of the new dosage form, FDA affirmed that AstraZeneca should submit acalabrutinib maleate salt to FDA via a separate original NDA pursuant to Section 505(b)(1) of the FDCA—which is the traditional approval pathway for new drugs and requires full reports of investigations of safety and effectiveness. *See* Food & Drug Admin., April 17, 2019 Type C Meeting Minutes; *see also Separate Marketing Applications Guidance* at 3 & n.7 ("Every different active ingredient[ ] should be submitted in a separate original application," even if they share "the same active moiety.").

85.     AstraZeneca submitted a new original NDA in accordance with FDA's direction, including data supporting the safety and efficacy of acalabrutinib maleate salt and showing that a broader patient population would be able to benefit from acalabrutinib maleate salt as compared to the acalabrutinib free base. *See* Shringi Sharma et al., *Bioequivalence and Relative Bioavailability Studies to Assess a New Acalabrutinib Formulation That Enables Coadministration With Proton-Pump Inhibitors,* 11 Clin. Pharm. Drug Dev. 1294 (2022).

86.     FDA approved the new NDA, uniquely identified by the number 216387, for the salt in 2022, concluding there was substantial data to support the effectiveness and safety of the

new product.[7] Like the free base, acalabrutinib maleate salt is indicated for the treatment of adult patients with MCL who have received at least one prior therapy, transplant-ineligible adult patients with previously untreated MCL (in combination with bendamustine and rituximab), and adult patients with CLL or SLL. Importantly though, the label for acalabrutinib maleate salt does not include a caution against co-administration with gastric-reducing agents. Thus, unlike acalabrutinib free base, acalabrutinib maleate salt can be taken with acid-reducing agents such as PPIs, antacids, or H2-receptor antagonists without any dosing restrictions or modifications.

## LEGAL ALLEGATIONS

### *CMS's Attempt to Override the IRA's Express Limits Plainly Exceeds Its Statutory Authority*

87.    As discussed, the IRA provides that "the Secretary shall select and publish a list of . . . 15 negotiation-eligible drugs" for IPAY 2027. 42 U.S.C. § 1320f–1(a). That instruction is clear, and Congress did not create any exceptions. In the Final Guidance, however, CMS sought to override that limit by redefining QSSD to group together *multiple* drugs.[8] But nothing in the statute—either in the QSSD provision or elsewhere—allows the agency to ignore the numerical limit.

#### The IRA Defines QSSD by Reference to a Drug's NDA Approval

88.    Just as the number "15" is unambiguous, the requirements for a QSSD are clear under the statute.

---

[7] Because AstraZeneca sought approval for acalabrutinib salt for two different indications, FDA designated the NDA as two original applications for administrative purposes. FDA reviewed both applications under the same NDA number (216387). FDA designated the application for the CLL and SLL indication as "NDA 216387/Original 1," and designated the application for the MCL indication as "NDA 216387/Original 2."

[8] On January 17, 2025, CMS published a list of drugs approved under *twenty-six* distinct NDAs. Among the twenty-six NDAs selected for the Program's second cycle, three have been administratively closed by the FDA. In any case, the number of drugs selected by CMS for the second cycle far exceeds the statutory limit of "15 negotiation-eligible drugs." *Id.* § 1320f–1(a)(2).

89.    The statute defines QSSD to include a drug that is "a covered part D drug (as defined in [42 U.S.C. § 1395w–102(e)])" and:

> (i) that is approved under section 355(c) of title 21 and is marketed pursuant to such approval;

> (ii) for which, as of the selected drug publication date with respect to such initial price applicability year, at least 7 years will have elapsed since the date of such approval; and

> (iii) that is not the listed drug for any drug that is approved and marketed under section 355(j) of title 21.

*Id.* § 1320f–1(e)(1)(A). Several aspects of this definition make clear that a QSSD is limited to a single drug approved under a single NDA.

90.    Start with the requirement that the drug must be "a covered part D drug (as defined in [42 U.S.C. § 1395w–102(e)])." The referenced provision defines a "covered part D drug" to mean, as relevant here, "a drug that may be dispensed only upon a prescription and that is described in subparagraph (A)(i), (A)(ii), or (A)(iii) of section 1396r–8(k)(2) of this title." *Id.* § 1395w–102(e)(1)(A). And those references, in turn, define "covered outpatient drug" to mean a drug "which is approved for safety and effectiveness as a prescription drug under section 505 . . . of the Federal Food, Drug, and Cosmetic Act [*i.e.*, a brand-name drug or authorized generic] or which is approved under section 505(j) of such Act [*i.e.*, a generic drug]." *Id.* § 1396r–8(k)(2)(A)(i).

91.    The IRA's definition of a QSSD is thus limited to a drug "which is approved for safety and effectiveness as a prescription drug under section 505 . . . of the Federal Food, Drug, and Cosmetic Act." *Id.* And Section 505 of the FDCA, which is codified at 21 U.S.C. § 355, lays out the FDA's basic framework for approving and licensing new drugs: the NDA. In other words, the statutory definition of a QSSD is grounded in FDA's framework for approving drug products, which distinguishes between drug products via distinct NDAs. By expressly defining a QSSD as a drug "which is approved" under the NDA-approval framework, Congress clearly intended that

CMS rely on this framework in distinguishing among QSSDs, making clear that a drug approved under its own NDA must also be treated as its own QSSD.

92.     Other aspects of the QSSD definition further confirm that Congress intended to rely on the NDA-approval framework for distinguishing among QSSDs. Subparagraph (i) limits the definition to a drug that "is marketed pursuant to such approval." Since the FDA's approval of an NDA constitutes the requisite legal permission under which a drug "is marketed," *id.* § 355(d), the term "such approval" (in the singular) must refer to the grant of the single, specific NDA that provides such permission. Conversely, a drug approved under a *different* NDA could not be described as being "marketed pursuant to such approval." A drug approved under a separate NDA—under a separate *New Drug* Application—is just that: a new drug, which also must be a new QSSD.

93.     Further, Subparagraph (ii) requires that at least seven years have elapsed between the grant of a drug's NDA ("such approval") and selection of the drug under the IRA. Congress established this timing to allow manufacturers a period of time to recoup their investment in developing the drug before becoming subjected to price controls, and to not interfere with common periods of marketing exclusivity that FDA may grant in association with its approval of an NDA. For example, New Chemical Entity (NCE) exclusivity runs for 5 years (which can effectively be extended up to 7.5 years under the Hatch-Waxman Act), *see* 21 U.S.C. § 355(j)(5); 21 C.F.R. § 314.108; new Clinical Investigation Exclusivity runs for three years, *see id.*; and orphan drug exclusivity runs for up to 7 years, *see* 21 U.S.C. § 360cc; 21 C.F.R. § 316.31. Since each NDA approval is made on a specific date, 21 U.S.C. § 355(c)(3), each "such approval" generates its own seven-year exemption period under the IRA.

94.    Subparagraph (iii), which excludes brand-name drugs with an approved and marketed generic, accords with this reading as well. By excluding "the listed drug for any drug that is approved and marketed under section 355(j)"—*i.e.*, the brand-name drug that serves as the reference for an approved and marketed generic drug—the IRA necessarily uses "drug" to mean a product approved under a single, specific NDA. That is because, under the FDCA, the sponsor of a generic product applies for approval by identifying a *specific* NDA to serve as its "listed" (brand-name) reference drug. *Id.* § 355(j)(2)(A)(i). The FDA, in turn, approves a generic application based on that specific NDA, 21 C.F.R. § 314.92, and permission to market the generic drug remains tied to the listed drug's NDA status, *id.* § 314.151. By excluding a "listed drug" from the QSSD definition, therefore, subparagraph (iii) confirms yet again that "drug" refers to a particular drug marketed pursuant to a specific NDA.

95.    Congress's decision to incorporate the NDA framework into the QSSD definition is unsurprising given FDA's expertise in determining the features that distinguish individual drug products. Whether a particular product constitutes a distinct "drug" is a scientific determination "peculiarly suited to initial determination by the FDA." *Weinberger v. Bentex Pharms., Inc.*, 412 U.S. 645, 653 (1973). Indeed, FDA has long understood the characteristics that make individual drugs distinct, which include "not only the active ingredient but also information about the drug's formulation, route of administration, labeling, inactive ingredients, bioavailability, and manufacturing processes." 86 Fed. Reg. at 28605, 28606. These determinations thus "ha[ve] significant implications for public health." *Id.* Manufacturers, in turn, have long relied on FDA's drug-approval framework as the basis for making decisions regarding research and development.

<u>The Final Guidance Attempts to Override the Act's Numerical Limits</u>

96.     Despite the IRA's clear language, the Final Guidance seeks to expand the IRA's numerical limits by defining QSSD in a different—and far broader—manner than the statute: "CMS will identify a potential qualifying single source drug using . . . *all* dosage forms and strengths of the drug with the same active moiety and the same holder of [an NDA], *inclusive of products that are marketed pursuant to different NDAs*." Final Guidance § 30.1 at 167 (emphasis added) (footnote omitted). The Final Guidance thus groups together, into a single QSSD, separately approved drugs if they have (a) the same active moiety and (b) the same NDA-holder. The Final Guidance also provides that, in determining when the seven-year exemption period begins to run for a group of drugs that have different NDA-approval dates, "CMS will use the earliest date of approval or licensure of the initial FDA application number assigned to the NDA . . . holder for the active moiety." *Id.* at 170.

97.     The result of CMS's approach is to group together *distinct* drugs, expanding the Act's numerical limits and rendering drugs eligible for "negotiation" under the IRA in circumstances where the statute says they should *not* be eligible:

        i.     Whenever CMS treats two or more distinct drugs as a single QSSD, the number of drugs selected *always* will exceed the statutory limits on the number of drugs to be selected per cycle of price-setting under the IRA. For instance, even though Congress limited the first cycle to "10 negotiation-eligible drugs," 42 U.S.C. § 1320f–1(a)(1), CMS in fact selected drugs approved under sixteen different NDAs. And even though the statute limits the second cycle to "15 negotiation-eligible drugs," *id.* § 1320f–1(a)(2), CMS in fact selected drugs approved under twenty-six distinct NDAs.

        ii.    A drug may become negotiation-eligible significantly earlier in time than the statutorily prescribed seven-year exemption period, based on the earlier approval

date of a *different* drug. If "at least 7 years . . . have elapsed since the date of [NDA] approval" for one drug, *id.* § 1320f–1(e)(1)(A)(ii), but less than seven years have elapsed since the date of NDA approval for *other* drugs that share the same active moiety and NDA-holder, then the agency "will use the earliest date of approval" to determine whether the combined group qualifies as a QSSD. Final Guidance § 30.1 at 170. Indeed, a later-approved drug could even be subject to selection and negotiation *immediately* upon approval, if grouped together with another drug whose approval occurred more than seven years prior.

      iii.    Combining a drug's Medicare expenditures together with the expenditures of one or more distinct drugs can also significantly increase the likelihood that the combined group ranks sufficiently high on the Medicare-expenditure list to trigger selection. Since negotiation-eligible drugs are "ranked" according to "the total expenditures for such drugs under" Medicare, and since CMS must "[s]elect from such ranked drugs . . . the negotiation-eligible drugs with the highest rankings," 42 U.S.C. § 1320f–1(b)(1)(A)-(B), CMS's approach of treating multiple drugs collectively makes it more likely that expenditures for the combined group will reach the threshold necessary for selection—including where none of the drugs would satisfy the threshold on its own.

    98.    To justify redefining QSSDs in this manner, the Final Guidance invokes language from two *different* statutory provisions—language that is noticeably absent from the statute's definition of QSSD. The IRA's "Use of Data" provision requires CMS, *after* determining whether a product qualifies as a QSSD, to then "aggregate data "across dosage forms and strengths of the drug" to determine whether total expenditures for that particular QSSD meet the threshold for

32

negotiation eligibility. *Id.* § 1320f–1(d)(3)(B). And among the "Administrative duties" imposed on the agency, CMS must "compute and apply the [MFP] across different strengths and dosage forms of a selected drug." *Id.* § 1320f–5(a)(2). According to CMS's Final Guidance, these "aggregation rules . . . necessarily establish[] that the negotiation procedures apply more broadly than to a distinct NDA." Final Guidance at 13. But in fact, neither provision supports the agency's approach.

99.     Consider the "Use of Data" provision, which is found in subsection (d) of 42 U.S.C. § 1320f–1 and reads in full:

> In determining whether a qualifying single source drug satisfies any of the criteria described in paragraph (1) or (2) [*i.e.*, the criteria for a negotiation-eligible drug], the Secretary shall use data that is aggregated across dosage forms and strengths of the drug, including new formulations of the drug, such as an extended release formulation, and not based on the specific formulation or package size or package type of the drug.

42 U.S.C. § 1320f–1(d)(3)(B). This Use of Data provision cannot remotely be read as permitting the agency to group multiple different drugs together. As an initial matter, no such language appears in the statutory definition of QSSD, which is contained exclusively in a different subsection—subsection (e) of 42 U.S.C. § 1320f–1. The fact that Congress chose *not to* include the Use of Data provision in the QSSD definition itself undermines the agency's attempt to insert it there.

100.     The Use of Data provision's text and operation also foreclose the government's reading of it. Its stated function is to provide instructions, at the Program's second stage of selection, as to whether a particular QSSD "satisfies any of the criteria" for negotiation-eligibility. *See supra* ¶¶ 53-54. The text specifies that "the Secretary shall use data that is aggregated across dosage forms and strengths" of a QSSD, "including new formulations *of the drug*, such as an extended-release formulation, and not based on the specific formulation or package size or package

type *of the drug*" in determining whether a QSSD satisfies any of the selection criteria. 42 U.S.C. § 1320f–1(d)(3)(B) (emphases added). The emphasized phrases ("of the drug") show that this provision instructs the agency on how to aggregate across different dosage forms, strengths, and formulations of a particular QSSD. Identification of the relevant QSSD is thus a predicate determination; the "Use of Data" provision has effect only *after* the agency has identified the QSSD at the Program's first stage. *See supra* ¶¶ 53-54. The Use of Data provision thus aggregates dosages forms and strengths only within a *previously identified* QSSD—that is, dosage forms and strengths of a drug that were approved under the same NDA. The provision has no bearing on whether a drug qualifies as a QSSD in the first place.

101.    The other provision invoked by the Final Guidance, which requires CMS to "compute and apply the [MFP] across different strengths and dosage forms of a selected drug," 42 U.S.C. § 1320f–5(a)(2), likewise does not support the agency's attempt to group multiple drugs together. The compute-and-apply provision applies at the *last* step of price-setting: After CMS has identified all QSSDs, determined which of them are negotiation-eligible, selected the number of them appropriate for the annual cycle, and set each drug's MFP, then CMS must "compute and apply" the MFP across different dosage forms and strengths of the drug. That requirement, however, has no relevance to the definition of a QSSD, which must be identified at the very *first* stage of price-setting. Like the Use of Data provision, the "compute and apply" instruction simply directs CMS to take an action with respect to those dosage forms and strengths that fall within a single QSSD—that is, to take action with respect to those dosage forms and strengths approved under the same NDA. This compute-and-apply instruction is not an invitation to expand the meaning of a QSSD beyond its statutory definition.

102.    The Final Guidance nevertheless argues that the Use of Data and compute-and-apply provisions must be read to *implicitly* require aggregation of drugs approved under separate NDAs. "Because different dosage forms and strengths, as well as different formulations, containing the same active moiety / active ingredient may be approved . . . under multiple NDAs," the agency contends, "the statutory negotiation procedures [must] apply more broadly than to a distinct NDA." Final Guidance at 13. Otherwise, the agency concludes, the Use of Data and compute-and-apply provisions would be without "full effect." *Id.*

103.    The agency's argument is a non-sequitur. While different dosage forms, strengths, and formulations are *sometimes* approved under multiple NDAs, that is not *always* the case: It is not uncommon for different dosage forms, strengths, and formulations of a drug to be encompassed within a single NDA. *See supra* ¶¶ 36-45. In such a case, the Use of Data provision ensures that all such forms, strengths, and formulations of a QSSD are aggregated for purposes of determining whether the drug is negotiation-eligible; and the compute-and-apply provision ensures that the MFP is applied to all of them. There is accordingly no need, in order to give these provisions "full effect," to construe them as implicitly imposing an atextual reading on the QSSD definition.[9] To the contrary, the fact that Congress expressly included certain

_____

[9] The agency also briefly argues that its approach is supported by 42 U.S.C. § 1320f–3(e)(1)(D), which requires CMS, "[f]or purposes of negotiating the maximum fair price of a selected drug . . . with the manufacturer of the drug," to consider (among other factors) "applications and approvals under section 355(c) of title 21." According to CMS, because Congress used "'applications and approvals' . . . in the plural, for the 'drug,' in the singular," that must mean a single drug can include products approved under separate NDAs. Final Guidance at 13. But as noted above, a drug approved under a particular NDA is often associated with one or more "supplemental applications," such as when a manufacturer seeks approval for a different strength that is supported by existing data. 21 U.S.C. § 355(c)(5); *see supra* ¶ 42. In such a case, there are multiple "applications and approvals under section 355(c) of title 21," but only one "drug." If anything, the agency's emphasis on the "plural" use of "approvals" in Section 1320f–3(e)(1)(D) underscores the agency's failure to acknowledge the *singular* use of "such approval" in the QSSD definition.

"aggregation" instructions elsewhere in the statute, yet *declined* to do so with respect to QSSDs, reinforces Congress's intent to define QSSDs by each separate NDA approval.

104.    Moreover, CMS has not attempted to—and cannot—justify the agency's invention of two very different criteria for identifying individual QSSDs that appear nowhere in the statute: common active moiety and common NDA-holder.

105.    The term "active moiety" has a well-established legal meaning. "*Active moiety* is the molecule or ion . . . responsible for the physiological or pharmacological action of the drug substance." 21 C.F.R. § 314.3. If Congress intended for QSSDs to be grouped based on their active moiety, it could have included this term in the QSSD definition—but it did not. Congress is familiar with the term "active moiety," which appears in five sections of the U.S. Code. *See* 21 U.S.C. §§ 355, 360b, 360n, 360ff, 360bbb-4a. The fact that the term "active moiety" does not appear in the QSSD definition—or, for that matter, anywhere in title 42 of the U.S. Code—is accordingly quite significant.

106.    The agency's use of "active moiety" is mirrored by the agency's adoption of still another atextual requirement—namely, that the drugs must be manufactured by "the same holder of a New Drug Application (NDA)." Final Guidance § 30.1 at 167 (footnote omitted). CMS likely realized that it could not lump together drugs that share the same active moiety without risking the creation of multi-drug groups in which some of the drugs did *not* share the same manufacturer. That scenario would create numerous inconsistencies with the IRA's so-called "negotiation" process, which requires CMS (*inter alia*) to sign an agreement to negotiate with "*the* manufacturer" of a selected drug, 42 U.S.C. § 1320f–2(a), (d) (emphasis added), to receive information relevant to the negotiation from "*the* manufacturer," *id.* § 1320f–3(b)(2) (emphasis added), to negotiate for an MFP with "*the* manufacturer," *id.* § 1320f–3(a) (emphasis added), and to ensure that "*the*

manufacturer" provides access to the resulting MFP, *id.* § 1320f–2(a)(2) (emphasis added). So CMS adopted the same-NDA-holder requirement as a workaround for these problems.

107.    Yet CMS's workaround, however much it solves the *practical* problems that the agency has created for itself, is entirely unmoored from the statutory definition of QSSD and the supposed textual justification for the same-active-moiety test, which is tied to the Use of Data and compute-and-apply provisions. Indeed, the very need to solve these practical problems via an atextual workaround is itself yet another indication of how far the agency's approach deviates from the statute's plain language.[10]

108.    Ultimately, CMS's reading of the IRA contravenes its plain text. The agency ignores key language and ascribes nonsensical meaning to key provisions. These linguistic gymnastics are intended to achieve an obvious goal: enabling the agency to set prices for more drugs than the IRA allows. But the "best reading" of a statute—which is the only "permissible" interpretation—is "the reading the court would [reach] if no agency were involved." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 400 (2024) (quotation marks omitted). Only a straightforward reading of the statute—one that limits a QSSD to those dosage forms and strengths approved under a *single* NDA, including its supplements—makes sense of all the statutory

---

[10] The Final Guidance states that its approach "will decrease incentives for pharmaceutical manufacturers to engage in 'product hopping,'" because it ensures that "a manufacturer is . . . limited in its ability to inappropriately exclude from the Negotiation Program drug products that might otherwise be eligible based on modest or minor modifications." Final Guidance at 13. The guidance also states that "[r]educing 'product hopping' is consistent with the purpose of the statute, which is to ensure that the Negotiation Program delivers benefits to the Medicare program and its beneficiaries." *Id.* But even accepting the agency's assertion that one of the IRA's goals is to reduce "product hopping"—despite the law's failure to say so—that does not permit the agency to ignore clear numerical limits on its authority or to invent statutory terms and criteria that appear nowhere in the IRA's text.

language and operates seamlessly through each step of the Program. No acrobatics or atextual criteria required.

109.    By improperly redefining QSSD to circumvent the statutory requirement to "publish a list of" only fifteen drugs, the Final Guidance is facially unlawful. 42 U.S.C. § 1320f–1(a). Thus, CMS clearly exceeded its statutory authority.

### The Agency's Approach Harms Drug Innovation Generally and AstraZeneca in Particular

110.    By aggregating multiple drugs approved under different NDAs, Section 30 disincentivizes innovation, to the detriment of patients, manufacturers, and the nation's healthcare system. It will also have concrete negative effects on AstraZeneca specifically.

111.    Pharmaceutical manufacturers like AstraZeneca discover and develop lifesaving and life-enhancing medicines that are distributed, prescribed, and used across the nation and around the world. Two therapy areas to which AstraZeneca devotes itself are Oncology and Rare Diseases. In Oncology, AstraZeneca focuses on some of the most hostile and hard-to-treat cancers including pancreatic cancer; certain blood cancers; and breast, lung, ovarian, and prostate cancers. AstraZeneca's rare disease division, Alexion, is focused on transforming the lives of people affected by rare diseases, driving innovative research and development across new disease targets and modalities, and supporting access and advocating for the rare disease community.

112.    The cost of developing such groundbreaking drugs is stunning. Pharmaceutical manufacturers expend vast amounts of time and resources to identify, test, and develop new drugs products, with the average cost of successfully bringing a drug to market now reaching $2.3 billion. *See* Deloitte, *Seize the Digital Momentum: Measuring the Return from Pharmaceutical Innovation* 2022 at 12 (Jan. 2023), https://perma.cc/XGN2-DE4M. AstraZeneca in particular makes substantial investments in scientific innovation and pharmaceutical research; in 2024, the company

reported over $13.6 billion in research and development expenses. *See* AstraZeneca Annual Report 6 (2024), https://bit.ly/3XXhVef.

113.    Manufacturers who make these massive investments in hopes of developing new treatments for patients also face incredibly long odds. Only one compound in 5,000 that enters preclinical testing will achieve FDA approval, for a failure rate of 99.98%. Sandra Kraljevic et al., *Accelerating Drug Discovery*, 5 Eur. Mol. Bio. Org. Reps. 837, 837 (2004). Of the therapies approved for patient use, only one-third manage to cover their costs of development, much less to provide an economic return significant enough to allow for continued investment and innovation. *See* Vernon & Golec at 7. Pharmaceutical manufacturers like AstraZeneca therefore must make these high-risk up-front investments based on an uncertain prospect—that *if* they discover a compound, *if* it can be made into a drug that proves safe and efficacious, *if* it obtains regulatory approval, and *if* it reaches patients and fulfills a medical need, the product *might* earn market-based returns.

114.    The interpretation of QSSD set forth in Section 30 significantly undermines incentives to research and develop new treatment applications, or to improve safety and efficacy for existing drugs. Under the agency's improperly broad definition, it may not be feasible for manufacturers to invest the necessary resources—potentially billions of dollars of R&D costs and years of manpower—into researching whether an active moiety in an existing drug could also be used to treat a separate disease or could be reformulated to be safer or more effective for patients. If the manufacturer identifies such an application, under CMS's approach, the new drug's eligibility for CMS's price "negotiation" program would be tied to the eligibility timeline of the earliest-existing drug with the same active moiety, limiting the manufacturer's ability even to attempt to recoup its investment.

115.    Indeed, Section 30 can actually act as a *disincentive* to innovate. As noted above, CMS's approach of treating multiple drugs collectively makes it more likely that Medicare expenditures for the combined group will reach the threshold necessary for selection. *See supra* ¶ 98.iii. As a result, where an earlier-developed drug would not satisfy the expenditure threshold on its own, a manufacturer who develops a new drug with the same active moiety runs the risk that any Medicare expenditures for the new drug will push the combination into the top ten, fifteen, or twenty QSSDs to be selected for that cycle. Given the draconian price cuts mandated by the IRA for selected drugs—which, under CMS's approach, would apply to both drugs—the manufacturer may well be better off *not* developing the new product. Thus, the harms of Section 30's approach are not limited to only those drugs selected for price-setting in the 2027 Program cycle.

116.    But as it pertains to the 2027 Program cycle, the harms caused by CMS's approach are clearly illustrated by its effect on two products manufactured by AstraZeneca to treat certain forms of blood cancer, acalabrutinib free base and acalabrutinib maleate salt, both of which are marketed under the tradename CALQUENCE®.

117.    The FDA granted an NDA for acalabrutinib free base in 2017. But the label for this product cautioned to avoid co-administration with many common stomach acid-reducing medications, significantly limiting the patient population able to benefit from acalabrutinib. AstraZeneca accordingly invested substantial resources into developing a new drug, acalabrutinib maleate salt, that has the same treatment efficacy as acalabrutinib but can also be taken along with gastric acid-reducing agents. At FDA's direction, AstraZeneca submitted a new original NDA for acalabrutinib maleate salt and obtained approval for this new product on August 3, 2022. Given the broader (but overlapping) patient population able to use acalabrutinib maleate salt, AstraZeneca ceased distribution of acalabrutinib free base in the United States at the end of 2022.

118.     Under the IRA, acalabrutinib maleate salt cannot qualify as a QSSD until at least February 1, 2030, because that is the first selection date that will take place seven years after the NDA approval for acalabrutinib maleate salt, and acalabrutinib maleate salt may only be "marketed pursuant to such approval"—*i.e.*, pursuant to the approval of the 2022 NDA. 42 U.S.C. § 1320f–1(e)(1)(A)(ii).

119.     Yet on January 17, 2025, CMS, applying Section 30 of the Final Guidance, treated the two separately approved products (acalabrutinib free base and acalabrutinib maleate salt) as a single QSSD and selected both of them for the IRA's so-called "negotiation" process.

120.     Section 30's improper interpretation of the statute thus has caused, and will continue to cause, concrete harm to AstraZeneca. AstraZeneca has been forced to participate in a sham "negotiation," which resulted in CMS setting a Medicare price for two distinct products— acalabrutinib free base and acalabrutinib maleate salt—neither of which independently meets the statutory requirements for selection. Acalabrutinib maleate salt thus became subject to the IRA's price-setting process less than three years after its approval as new drug by FDA, rather than the seven-year exemption period prescribed by Congress. And the agency imposed a price cap for acalabrutinib free base, even though that product was not eligible for the Program based on its Medicare expenditures. The government-imposed price is set to be $8,600 for a 30 day-equivalent supply, a steep cut from the current, market-based prices for these products.

121.     AstraZeneca has no feasible alternative. As the Congressional Budget Office recognized when analyzing an earlier draft of the IRA, the excise tax is so steep that no manufacturer could realistically pay it. *See* Cong. Budget Off., *CBO's Model of Drug Price Negotiations Under the Elijah E. Cummings Lower Drug Costs Now Act* (Feb. 2021), https://www.cbo.gov/system/files/2021-02/56905-Drug-Price-Negotiations.pdf ("CBO and the

staff of the Joint Committee on Taxation (JCT) expect that a manufacturer would remove its drug from the U.S. market rather than pay the excise tax."). Moreover, exiting Medicare and Medicaid with respect to all of its products is entirely unfeasible for AstraZeneca, as it would leave millions of patients without access to necessary medications and decimate AstraZeneca's business; Medicare and Medicaid collectively account for approximately more than 40% of the company's gross revenues in the U.S.

**CLAIM FOR RELIEF**
**(Contrary to Law and *Ultra Vires*)**

122.     AstraZeneca realleges and incorporates by reference all prior and subsequent paragraphs.

123.     The Administrative Procedure Act (APA) requires courts to "hold unlawful and set aside" agency action that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). "The APA, in short, incorporates the traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 394 (2024). The "command of the APA" thus is "that 'the reviewing court'—not the agency whose action it reviews—is to 'decide all relevant questions of law' and 'interpret statutory provisions.'" *Id.* at 398 (quoting 5 U.S.C. § 706) (ellipsis omitted).

124.     Further, an agency has no power to act unless Congress confers power upon it. *See City of Arlington v. FCC*, 569 U.S. 290, 299 (2013); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) (explaining that "an agency literally has no power to act . . . unless and until Congress confers power upon it"). Thus, an agency's actions are *ultra vires* when it "exceed[s] the scope of its delegated authority or violate[s] a clear statutory mandate." *Hanauer v. Reich*, 82 F.3d 1304, 1307 (4th Cir. 1996).

125.    CMS's redefinition of QSSD, requiring the publication of a list of more than "15 negotiation-eligible drugs" for the Program's second cycle, is contrary to law, exceeds the agency's statutory authority and is *ultra vires*. 42 U.S.C. § 1320f–1(a)(2).

126.    By redefining QSSD as "all dosage forms and strengths of the drug with the same active moiety and the same holder of [an NDA], *inclusive of products that are marketed pursuant to different NDAs*," Final Guidance § 30.1 at 167 (emphasis added) (footnote omitted), CMS's Final Guidance facially contravenes the statutory text and (i) the IRA's numerical limits on drugs selected per cycle; (ii) the seven-year exemption period for newly approved drugs; and (iii) eligibility requirements for selecting only those drugs with the highest Medicare spending.

127.    First, CMS's definition contravenes the statutory requirement that a QSSD received approval under a single NDA, causing CMS to exceed the statutory limits on the number of drugs to be selected per cycle of price-setting under the IRA. *See* 42 U.S.C. §§ 1320f–1(a).

128.    Second, in determining when the seven-year exemption period begins to run for a group of drugs that have different NDA-approval dates, "CMS will use the earliest date of approval or licensure of the initial FDA application number assigned to the NDA . . . holder for the active moiety." Final Guidance at 170. By permitting drugs to become negotiation-eligible based on the earlier approval date of a *different* drug, CMS's Final Guidance is irreconcilable with the statutorily prescribed seven-year exemption period. *See* 42 U.S.C. § 1320f–1(e)(1)(A)(ii).

129.    Finally, CMS's approach contradicts the IRA's requirement to rank drugs for negotiation eligibility according to "the total [Medicare] expenditures for such drugs." 42 U.S.C. § 1320f–1(b)(1)(A)-(B). CMS's approach instead combines particular drugs' Medicare expenditures with the expenditures of other, different drugs. This atextual approach impermissibly

increases the likelihood that a particular drug will be selected—as part of a combined group—for "negotiation."

130.    CMS's Final Guidance therefore is *ultra vires*, not in accordance with law, and in excess of statutory jurisdiction, authority, or limitations.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** AstraZeneca requests a judgment in its favor against Defendants as follows:

1.    Declare that Section 30.1 of the Final Guidance was promulgated in violation of the APA;

2.    Declare that Section 30.1 of the Final Guidance is not in accordance with law and was promulgated in excess of statutory jurisdiction, authority, or limitations;

3.    Declare that Section 30.1 of the Final Guidance is *ultra vires* and unenforceable;

4.    Set Section 30.1 of the Final Guidance aside;

5.    Enjoin CMS from enforcing Section 30.1 of the Final Guidance;

6.    Enjoin CMS from expanding the IRA's scope by exceeding the numerical limits on drug selection;

7.    Require CMS to comply with 42 U.S.C. § 1320f–1(a)(2) by publishing a list of no more than fifteen negotiation-eligible drugs with respect to initial price applicability year 2027;

8.    Award AstraZeneca reasonable attorneys' fees and costs, plus interest accruing thereon, under 28 U.S.C. § 2412; and

9.    Grant such other and further relief as the Court may deem appropriate.

Dated: December 19, 2025

Respectfully submitted,

*/s/ Michael A. Pichini*

Michael A. Pichini (Bar # 26342)
GOODELL, DEVRIES, LEECH & DANN, LLP
One South Street, 20th Floor
Baltimore, MD 21202
(410) 783-4000
map@gdldlaw.com

Allon Kedem*
Jeffrey L. Handwerker
Catherine A. Brandon*
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
(202) 942-5000
allon.kedem@arnoldporter.com

William T. Sharon*
Arnold & Porter Kaye Scholer LLP
250 West 55th St.,
New York, NY 10019-3743
(212) 836-8000
william.sharon@arnoldporter.com

*\* Application to be admitted pro hac vice
forthcoming*

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on Defendants in accordance with Fed.

R. Civ. P. 4.

*/s/ Michael A. Pichini*
Michael A. Pichini